PHILIP L. GUARINO, ESQ.
Guarino & Co. Law Firm, LLC
300 Main Street, Suite 552
Madison, NJ 07940
973/272-4147
E-mail: guarinolaw@gmail.com
Attorneys for FrontierBPM, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IT TRAILBLAZERS, LLC, | Civil Action No. 18-CV-14051-FLW-DEA |
| Plaintiff, | |
| v. | |
| FRONTIERBPM, INC. | **CERTIFICATION OF THEODORE SAK IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Defendant. | |

THEODORE SAK certifies :

1. I am an officer of defendant FrontierBPM, Inc. ("Frontier"). I make this Certification upon personal knowledge in opposition to the motion for partial summary judgment filed by IT Trailblazers, LLC ("Trailblazers").

2. Trailblazers engages in the business of supplying temporary personnel for use by companies such as Frontier. Frontier utilized the services of Trailblazers, and was supplied temporary personnel by it. It did so pursuant to a General Staffing Agreement (the "Agreement"), a copy of which is annexed as **Exhibit A**.

3. Frontier never would have engaged Trailblazers and utilized its services had Frontier known that personnel supplied by Trailblazers lacked proper experience and were not properly pre-qualified by Trailblazers.

4. That it was material and highly important to Frontier that personnel supplied be experienced and have the required technical expertise is made clear in the Agreement, as the Recital Section expressly states that Frontier needs to obtain "experienced personnel ... with verifiable experience in a technical discipline" that is desirable to Frontier. At Exhibit C of

the Agreement, Trailblazers **guaranties** that personnel it supplies "will have the qualifications that the Company requests, as interpreted by the Company."

5. Trailblazers fraudulently induced Frontier into utilizing its services through misleading and deceptive misrepresentations of material facts. Trailblazers never referred to itself as a "referral agency" (which gets a small percentage for finding someone), but rather advertised and referred to itself as a company that fully vetted all personnel (for a large percentage/fee)—which Trailblazers never did.

6. Trailblazers misrepresented that it only provided "experienced" and "pre-qualified" personnel. From first hand experience with the personnel provided by Trailblazers, I can certify that this is false. For the most part, the persons sent to Frontier by Trailblazers were incompetent, unproductive, unreliable (as far as time lines and delivery), and a complete waste of money. Yet, given the fees that were being charged Frontier every person sent to it by Trailblazers should have been a "superstar."

7. Trailblazers did not "pre-qualify" the personnel before offering them to Frontier, because Trailblazers did not have the in-house experience to validate their backgrounds. Trailblazers had represented that it had the in-house ability to interview and vet personnel, but it became obvious through personnel that it supplied that this was not so.

8. Trailblazers was contractually obligated to interview and vet personnel. Indeed, at paragraph 1(a) of the Agreement, Trailblazers agreed that it would "[r]ecruit, screen, interview, verify and assign its personnel ... to perform the type of work described on Exhibit A attached hereto." In the Recital Section of the Agreement, Trailblazers **warranted** "that it has the professional knowledge, expertise and experience to furnish such ... [personnel]." It didn't.

9. Trailblazers could not pre-qualify the personnel because Trailblazers itself never understood the technology utilized by Frontier and the industry, or Frontier's needs. It

became obvious that all that mattered to Trailblazers was to refer as much personnel as possible so as to create fees, and have Frontier perform all pre-qualification work.

10. Trailblazers also had represented that it compiled background checks on all personnel, but it never did so and just ignored this requirement. Trailblazers never provided background checks to Frontier as it was contractually required to do under Exhibit C of the Agreement. Frontier thus was constrained to conduct many background checks itself because of regulatory concerns with its clients. Again, at Exhibit C of the Agreement Trailblazers was expressly obligated to perform numerous types of background checks. It didn't.

11. It became clear that Trailblazers did not care about the quality of the personnel that it sent to Frontier; it just sent everyone that "walked in the door," which caused Frontier to waste countless hours vetting the personnel provided by Trailblazers. Most were eventually rejected by Frontier, and all of this resulted in the loss of time and money, and in project delays.

12. Trailblazers exhibited a total lack of regard for Frontier and for the quality of the personnel that it was sending to Frontier—even though at Exhibit C of the Agreement Trailblazers **guarantied** that personnel provided would have the qualifications requested and needed by Frontier. For example, Trailblazers was invited to participate in the screening/ interviewing being performed by Frontier, but nobody from Trailblazers would even attend to participate in the process.

13. Frontier did all of the qualifying work and coordination that Trailblazers was supposed to do pursuant to the Agreement and its representations. Trailblazers did nothing but farm out personnel from India without regard to the person's qualifications or ability to function within Frontier; Trailblazers did not perform as represented or pursuant to the Agreement. Trailblazer's non-performance resulted in Frontier spending countless hours doing pre-screening and qualifying/interviewing work that Trailblazers should have been

doing, only to reject the majority of the personnel sent by Trailblazers, and all of this cost Frontier a great deal of money.

14. It also became apparent that Trailblazers "fluffed" up the resumes of personnel supplied to Frontier to meet Frontier's needs, and that the resumes did not reflect the true experience of the personnel supplied. Indeed, the actual experience level of the personnel provided rarely matched what was indicated in the resume. Trailblazers obviously did not verify that the skill sets on resumes were accurate, which once again resulted in Frontier having to spend time and money doing the work that should have been performed by Trailblazers.

15. Trailblazers provided Frontier with a 10-day evaluation period concerning personnel that it supplied, but this was grossly insufficient. Usually it only became apparent that personnel supplied by Trailblazers were incompetent and lacked sufficient experience and training after the personnel had already started working on a project, at which point it became difficult to pull them off the project because they already had been introduced to the client project team. The incompetent and inadequately trained and inexperienced personnel supplied by Trailblazers hurt Frontier's projects, jeopardized its relationships with its clients, and affected its profitability. Because Frontier lacked sufficient time to determine the competency of the personnel provided by Trailblazers—which Trailblazers should have been doing but failed to do—Frontier was compelled to work with bad personnel, cover up their incompetence and "make it work." The alternative would have been to continuously change personnel, which would have created turmoil with clients and client projects, and would have seriously jeopardized Frontier's client relationships.

16. Trailblazers had been informed that a vital requirement of Frontier was that the personnel supplied be able to communicate well and interact with clients, but even this was

too difficult for Trailblazers. Trailblazers often provided personnel who could not speak or understand English well.

17. As Frontier worked with Trailblazers it became apparent that—contrary to its many representations—Trailblazers did not have the in-house competency to "qualify" personnel. Yet, Trailblazers continued to represent to Frontier that it was pre-qualifying personnel. This was completely false and deceptive. Again, because of Trailblazers' inability to qualify personnel, Frontier was forced to spend many hours doing the work of Trailblazers in qualifying personnel, only to reject a great number of persons. In reality, Trailblazers was delivering personnel to Frontier just to generate billing hours. All of this led to a constant lack of productivity and missed project deadlines by Frontier, making it more expensive for Frontier to deliver on a project. In some cases Frontier's relationships with its clients were jeopardized.

18. Even though it became apparent that Trailblazers was not pre-screening the personnel sent to Frontier, Frontier was compelled to use some of the persons sent to it because of the contractual obligations that it had with its clients regarding staffing and resourcing. Frontier received dozens and dozens of resumes from Trailblazers, and interviewed scores of persons after reviewing the resumes. Frontier did the work that Trailblazers was supposed to have done, and rejected those persons who were clearly inappropriate for the positions. As to the few persons remaining, Frontier had no choice but to utilize them. Frontier was operating under project deadlines, and it could not reject all the persons sent by Trailblazers. Nor could Frontier replace Trailblazers without risking seriously missing project deadlines and losing clients.

19. Trailblazers also induced Frontier to do business with it by falsely representing that the personnel to be provided were full-time employees of Trailblazers who were being contracted out to Frontier. On multiple occasions, however, Frontier discovered that

personnel sent to Frontier were just contractors of another company who had been re-assigned to Frontier. This was a serious problem for Frontier, because the personnel were to work on confidential software development projects of Frontier and had access to client data. Because Frontier had no knowledge of any contractual or confidential provisions that were in place between the personnel and third-parties, this created a serious contractual and ethical risk concerning Frontier's clients' projects. This was a serious issue because it caused Frontier to violate the master service agreements with its clients.

20. In February of 2018, for example, Ms. Arti Hareshbhai Gamara worked for Frontier on a project called the Ultragenyx - Pega 7.2.2 project. Frontier learned, however, that she was not a full-time employee of Trailblazers and that her true employer was I28 Technologies Corporation—a fact that was concealed from Frontier by Trailblazers.[1] Ms. Gamara later sent derogatory e-mails about Frontier to one of Frontier's biggest clients. Although this violated confidentiality provisions that Frontier had in place with Trailblazers, there was no way to enforce such provisions precisely because Ms. Gamara was not employed by Trailblazers.

21. The fact that the personnel provided were not Trailblazers employees also raised immigration concerns. Frontier had no idea how Trailblazers handled their H1B immigration process concerning the personnel that it provided from India.

22. After Frontier learned that Trailblazers was engaging in misrepresentations when it consistently represented that the personnel provided consisted of its employees, Frontier confronted Trailblazers. Girija Murali, the Senior Manager for Business Development at Trailblazers, at first tried to cover up Trailblazer's misrepresentations. Sampathkumar

---

[1] Frontier learned of many other persons who were supplied to Frontier yet not employed by Trailblazers. For example, Vikranth Dharipally was supplied, yet Frontier learned that he actually worked for Positive Group LLC—a fact concealed from Frontier by Trailblazers.

Kannan of Trailblazers admitted that they were not Trailblazer's employees, however, and then Girija Murali finally confirmed this as well.

23. The fact that the personnel provided to Frontier were not full-time Trailblazers employees also made them less reliable than they otherwise might have been. Even in rare cases where persons were in fact actually employed by Trailblazers, the persons were unreliable. For example, one Trailblazer employee supplied by Trailblazers who worked on a very high profile project of Frontier decided to travel to India. Without Frontier's knowledge or permission, the person told Frontier's client that he would work from India, where there is a 14-hour time difference making it very hard to get quality work done in a timely manner. Frontier was shocked to learn that the person had directly communicated with the client about this, and Frontier immediately told the person that communicating directly with Frontier's client and working from India was unacceptable and would put Frontier's relationship with its client at risk. The person nevertheless went to India, and did not return for several months. Frontier's client was very unhappy, because the person left at a very critical point in the project. The client was forced to work around the person's schedule in India with a 14-hour time difference, which created delays and much friction between the client and Frontier.

24. For all of these reasons, and because of dire financial pressure experienced by Frontier due to delays, missed deadlines and increased costs caused by the incompetent and inexperienced personnel supplied by Trailblazers, Frontier did not pay invoices submitted by Trailblazers.

25. Even though Frontier could—and should—have taken the position that Trailblazers was owed nothing because of its material breaches of the Agreement, in early to mid-2018 Kevin Hamilton, Frontier's Chief Business Officer, met with Nani Ramanujam ("Nani"), Trailblazer's principal, and his brother-in-law and minority owner of Trailblazers,

Sampathkumar Kannan. They met for over five hours, and an agreement was reached providing Frontier with time to make payment to Trailblazers. Nani referred to Frontier as a "business partner," and he recognized and stated that what was good for Frontier long term with its clients would be good for Trailblazers. Trailblazers was told that Frontier was executing a plan to raise capital from the investment community within a 9-month time frame. It was in this context that an agreement was reached allowing Frontier 18 months within which to make payment to Trailblazers. Trailblazers insisted that during this 18-month period Frontier maintain an active business relationship with Trailblazers.

26. The agreement with Trailblazers was verbal and was memorialized that same day over lunch. The next day, Nani called to indicate that he did not think it was right that Trailblazers "finance" Frontier's structured payable, and Frontier authorized the payment of six percent (6%) simple interest over the 18-month term. Nani agreed to this, and a firm contract then existed between Trailblazers and Frontier.

27. When a written agreement supposedly incorporating the terms that had been agreed upon was received signed by Trailblazers, it contained numerous provisions that had not been agreed upon. *See* Agreement, annexed as **Exhibit B**. Most significantly, it contained a confirmation by Frontier that $372,520.76 was due Trailblazers, when this was not the case; that Frontier had no defense or counterclaim, or any claim of setoff or recoupment, when this was not the case; that $68,55.65 would be immediately due, when this had never been agreed upon; and that in the event of a breach there would be default interest of 18% and late fees, when this had never been agreed upon. Nani would not agree to abide by the terms that had actually been agreed upon, and he said that if the egregious agreement that he sent were not signed, then Trailblazers would sue Frontier.

28. When Frontier refused to sign the overbearing agreement, Nani later informed Frontier that he wanted to receive as much money from Frontier in the shortest amount of

time possible, but he clearly and definitely represented to Kevin Hamilton that if money were paid by Frontier in good faith then he would provide more time. Frontier relied upon this representation and changed its position to its detriment, as Trailblazers clearly expected and intended that it would, in that thereafter, over the next 30 to 40 days, Frontier paid Trailblazers $70,000. When Nani was then contacted to talk about Frontier's "good faith" payments, however, his response was to file the prior lawsuit on June 13, 2018 without any prior notice to Frontier. Trailblazers clearly never had any intention of providing more time if it received "good faith" payments from Frontier, and misrepresented its intentions.

29. Had Nani and Trailblazers kept their word and provided the 18-months that had been agreed upon without including in the written agreement egregious, overbearing terms that had never been agreed upon, there never would have been any breach of that agreement by Frontier because the structured payments were feasible.

30. The prior lawsuit never should have been filed, and was wrongful, because (i) Trailblazers materially breached the original Agreement, as set forth *supra*, and therefore Frontier now understands after conferring with counsel that it was relieved of any obligation to make payment, (ii) Trailblazers and Frontier had reached an agreement regarding payment terms that Trailblazers breached by sending a written agreement that contained egregious terms that had never been agreed upon, and (iii) Trailblazers misled Frontier into believing that if it made good faith payments then Frontier would be afforded more time—a misrepresentation that Frontier relied upon and that induced it to pay the $70,000.

31. Frontier settled the prior lawsuit at a time when it was busy raising venture capital, which it desperately needed precisely because of the financial pressure wrongfully caused by Trailblazers's wrongful breaches of contract and misrepresentations. Trailblazers was without counsel in negotiating and finalizing the settlement, and Kevin Hamilton of Frontier told Trailblazers that the payment terms were unreasonable, unworkable and

unrealistic. Trailblazers had been informed that Frontier was raising capital, and Trailblazers took unconscionable advantage of Frontier by reneging on its prior agreement to provide a payout structure of 18 months and also on its subsequent representation as to affording Frontier more time after good faith payments were made, and then by filing suit. Trailblazers did so because it knew that Frontier would have no choice but to settle the suit on egregious terms that were advantageous to Trailblazers. Trailblazers knew that the existence of a wrongfully-filed, pending lawsuit would create unconscionable economic duress to Frontier because it would materially jeopardize if not destroy Frontier's money-raising efforts—efforts that were made necessary by delays, missed deadlines and increased costs caused by Trailblazers.

32. Trailblazers also wrongfully coerced Frontier into settling and exercised wrongful economic duress by wrongfully threatening to remove two important persons that it had supplied and who were being used by Frontier in connection with two critical client projects. Trailblazers knew that the removal of these persons would most certainly cause Frontier to lose the two important clients, and Trailblazers knew that Frontier could not afford to lose clients given its dire financial circumstances that were caused by Trailblazers. The threats by Trailblazers were wrongful, because prior to filing suit and making such threats Trailblazers had agreed to provide time for payment by Frontier. The filing of suit and the threats to remove key personnel constituted a wrongful breach of that agreement and of representations that had been made to Frontier, all of which wrongfully coerced Frontier into signing the settlement agreement which contained egregious terms that were far more favorable to Trailblazers than were those contained in the oral agreement that Trailblazers breached. Trailblazers ultimately did not remove the two persons and let them continue providing services, but only because they were finishing up work. The persons were not in

any way urged by Trailblazers or anyone else to perform services in reliance on the settlement agreement or on promises of continued business.

33. Because of the dire financial circumstances wrongfully created by Trailblazers, as set forth *supra*, and because of its wrongful conduct in breaching the 18-month agreement, not abiding by its representation that time would be afforded Frontier if it made good faith payments, and then wrongfully filing suit and then threatening to withdraw two key personnel, Frontier had no choice but to sign the settlement agreement. Indeed, the filing of the suit was so deleterious to Frontier that it was forced to rapidly sign the settlement agreement to have the case voluntarily dismissed on July 3, 2018, when suit had only just been filed on June 13, 2018. Frontier needed to obtain additional capital and retain clients because of the financial situation created by Trailblazers, and Frontier clearly would not have been able to do so with a lawsuit pending and with key employees withdrawn by Trailblazers. Frontier signed the settlement agreement with a financial "gun at its head." Through its wrongful conduct Trailblazers stripped and deprived Frontier of its unfettered will, and the settlement agreement was not signed with free volition.

34. Finally, because of Trailblazer's material breaches Frontier now understands that as a matter of law nothing is due Trailblazers because Frontier has been relieved of all obligations under the Agreement. Even if money were due, *arguendo*, Trailblazers has not provided invoices to the Court to support its motion for partial summary judgment, has not provided any details as to amounts billed and paid, and has not otherwise provided the slightest detail as to how it arrives at the figure it claims to be due. I do not believe the figure is accurate. Trailblazers has included charges for personnel who were not qualified by Trailblazers and/or who were incompetent and unable to do the work they were assigned. Frontier has all along made Trailblazers aware that it disputes charges for such personnel, and

pursuant to Exhibit C of the Agreement Frontier is not to be charged for such personnel. Hence, the amount set forth by Trailblazers as being due is grossly inflated.

I certify that the foregoing statements made by me are true to the best of my knowledge and belief. I recognize that if any statement were to be willfully false, I would be subject to punishment.

_____
Theodore Sak